UNITED STATES DISTRICT COURT  C/M
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                           :
YOEL WEISSHAUS,                                            :
                                                           :  **MEMORANDUM DECISION**
                                        Plaintiff,         :  **AND ORDER**
                                                           :
                 - against -                               :  20-cv-5826 (BMC)
                                                           :
ANDREW CUOMO, in his official and                          :
 individual capacities,                                    :
                                                           :
                                        Defendant.         :
                                                           :
----------------------------------------------------------- X

**COGAN**, District Judge.

In response to the COVID-19 pandemic, the Governor of New York has required certain out-of-state travelers to complete the "New York State Traveler Health Form." It asks whether the travelers recently experienced any COVID-19 symptoms, tested positive, or arrived from a country with a high rate of the disease. The Governor insists that this requirement allows the State to safeguard public health. Plaintiff Yoel Weisshaus says it violates the Supremacy Clause. Because federal law does not preempt the Traveler Health Form requirement, the Governor's motion to dismiss is granted.

## BACKGROUND

As the Supreme Court recently observed, "Anyone who has applied for a passport, filed for Social Security benefits, or sought a license understands the government's affinity for forms." Niz-Chavez v. Garland, 141 S. Ct. 1474, 1478 (2021). Indeed, "[t]he world is awash in forms," id. at 1485, and the pandemic hardly stemmed the tide. The form in this case requires travelers to disclose certain information when they arrive in New York State. Travelers first disclose whether they have taken a COVID test or experienced any COVID symptoms in the last

72 hours. Travelers then state whether they have visited a country with a "CDC Level 2 or Level 3 health notice" in the last two weeks. If so, travelers must list the country, the duration of their stay, and their destination in New York State.[1]

The Traveler Health Form traces its origins to series of executive actions. The process began with Executive Order No. 205. It authorized the Commissioner of the Department of Health to issue a "travel advisory."[2] To "effectuate" that advisory, the Commissioner required "all travelers" arriving from states with certain rates of COVID-19 to "complete the New York State Traveler Health Form."[3] The State twice extended this requirement. First, the Governor required a form from all travelers "entering the United States from any country with a CDC Level 2 or Level 3 health notice."[4] Then, the Department of Health ordered that "[a]ll travelers must complete [the form] unless the traveler ha[s] left New York for less than 24 hours or is coming to New York from a contiguous state."[5]

To make sure travelers completed the form, the Governor dispatched state officials to international airports.[6] These officials met arriving passengers at the gate, requesting proof of

---

[1] This language refers to the Centers for Disease Control and Prevention's three-tiered system for "Travel Health Notices." See Travel Health Notices, Ctrs. For Disease Control & Prevention, https://wwwnc.cdc.gov/travel/notices#travel-notice-definitions (last reviewed June 16, 2021). The CDC advises travelers to countries at "Alert Level 2" to "[p]ractice enhanced precautions." Id. For countries at "Alert Level 3," travelers should "[a]void all non-essential travel." Id.

[2] N.Y. Exec. Order No. 205 (June 24, 2020), available at https://www.governor.ny.gov/news/no-205-quarantine-restrictions-travelers-arriving-new-york.

[3] N.Y. Dep't of Health, Order for Summary Action (July 13, 2020), available at Dkt. No. 16-3 at 2.

[4] N.Y. Exec. Order No. 205.1 (Sept. 28, 2020), available at https://www.governor.ny.gov/news/no-2051-quarantine-restrictions-travelers-arriving-new-york.

[5] N.Y. Dep't of Health, Updated Interim Guidance for Travelers Arriving in New York State (NYS) at 1 (Apr. 10, 2021), https://coronavirus.health.ny.gov/system/files/documents/2021/04/updated_travel_advisory_april_10_2021a.pdf. This same guidance explains that New York has lifted its quarantine requirements for domestic and international travelers. Id. These changes occurred while this lawsuit was pending.

[6] N.Y. Dep't of Health, COVID-19 Travel Advisory (Jan. 6, 2021), available at Dkt. No. 16-4 at 3-4.

completion.⁷ Failure to complete the form could result in a $10,000 "civil penalty" or imprisonment up to 15 days under § 229 of the New York Public Health Law.⁸

Plaintiff had his first run-in with this requirement in November 2020. After a short trip overseas, he arrived at John F. Kennedy International Airport and proceeded to customs. Federal officials asked if he had experienced any COVID symptoms. They provided a CDC pamphlet, which explained that travelers "may have been exposed to COVID-19" and instructed travelers how to "prevent others from getting sick." Plaintiff cleared customs. But, he alleges, the State's "armed security person[nel]" had "barricaded" the way out. They instructed him to complete the Traveler Health Form. He objected, but an agent stated, "You cannot leave until you complete the form." Plaintiff completed the form, and this lawsuit followed.

The complaint was rather opaque. I discerned several claims under 42 U.S.C. § 1983, based on violations of the Supremacy Clause, the right to interstate travel, the freedom of international travel, the right to informational privacy, and the substantive component of the Due Process Clause of the Fourteenth Amendment. I denied plaintiff's motion for a preliminary injunction. See Weisshaus v. Cuomo, No. 20-cv-5826, 2021 WL 103481, at *1 (E.D.N.Y. Jan. 11, 2021), appeal docketed, No. 21-64 (2d Cir. Jan. 12, 2021). When the Governor followed up with a motion to dismiss, plaintiff terminated his relationship with his attorney, decided to proceed *pro se*, and filed his Amended Complaint. It drops the original claim for damages, seeking only declaratory and injunctive relief. A motion to dismiss that Amended Complaint is now before me.⁹

---

⁷ Id. at 3.

⁸ N.Y. Dep't of Health, COVID-19 Travel Advisory, https://coronavirus.health.ny.gov/covid-19-travel-advisory (last visited June 16, 2021); see also N.Y. Exec. Order No. 205.1 (providing for a "civil penalty pursuant to the Public Health Law and regulations of the Department of Health").

⁹ The circumstances of plaintiff's decision to proceed *pro se* are not entirely clear. When a motion to dismiss the original complaint went unanswered, plaintiff notified the Court that his attorney had become "unreachable."

3

# DISCUSSION

## I. Standing

Under Article III, a court must always assure itself of a litigant's standing. See, e.g., Frank v. Gaos, 139 S. Ct. 1041, 1046 (2019). The "irreducible constitutional minimum of standing" requires (1) that the plaintiff have suffered an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant" and (3) "likely" to be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (*colatus*). The "injury in fact" must be "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." Id. at 560 (quoting another source).

Unique issues arise when a plaintiff seeks injunctive relief. See City of Los Angeles v. Lyons, 461 U.S. 95, 105-06 (1983). To have standing, a plaintiff must plausibly allege a "substantial risk of suffering a future injury." Liberian Cmty. Ass'n of Conn. v. Lamont, 970 F.3d 174, 184 (2d Cir. 2020). Although the Governor insists that plaintiff cannot satisfy this standard, plaintiff has alleged (A) that under an official policy, the State requires all travelers to complete the Traveler Health Form if they have left New York for more than 24 hours and are not coming to New York from a contiguous state; and (B) that he will travel again in August and October. These allegations confer standing to seek injunctive relief. See Deshawn E. ex rel. Charlotte E. v. Safir, 156 F.3d 340, 345 (2d Cir. 1998); Amadei v. Nielsen, 348 F. Supp. 3d 145, 159 (E.D.N.Y. 2018); see also Lyons, 461 U.S. at 105-06 (suggesting that this sort of two-pronged allegation would suffice).

---

Plaintiff had visited the attorney's office, only to learn that the attorney "ha[d] not been seen since February." Given plaintiff's *pro se* status, I will consider the allegations in the Amended Complaint, plaintiff's affirmation, and his memorandum opposing the Governor's motion to dismiss.

## II. The Supremacy Clause Claim

Plaintiff has based his claim on 6 U.S.C. § 211. The product of several acts of Congress, it sets forth the structure and duties of U.S. Customs and Border Protection ("CBP"). As relevant here, CBP must coordinate with other agencies to "enforce and administer . . . the inspection, processing, and admission of persons who seek to enter or depart the United States." § 211(c)(8)(A). This mandate, plaintiff argues, shows that Congress has preempted all state-law "screening or registration requirements" at a port of entry. He thus contends that the State cannot require the Traveler Health Form under the Supremacy Clause.

The Supremacy Clause "creates a rule of decision: Courts 'shall' regard the 'Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land.'" Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324 (2015) (quoting Art. VI, cl. 2). That rule "secures federal rights by according them priority whenever they come in conflict with state law." Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107 (1989) (*colatus*). But the Clause is not itself the "source of any federal rights." Id. (quoting another source).

Seizing on this principle, the Governor argues that plaintiff cannot state a claim because his cause of action, 42 U.S.C. § 1983, applies only if the plaintiff suffered a "deprivation of any *rights*, privileges, or immunities secured by the Constitution." Id. (emphasis added). True, a § 1983 claim does not "exist[] every time a federal rule of law pre-empts state regulatory authority." Golden State, 493 U.S. at 108. But when a plaintiff cannot pursue injunctive relief under § 1983, the plaintiff can sometimes seek that same relief under Ex parte Young, 209 U.S. 123 (1908).

The quintessential Ex parte Young suit involves "the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law."

5

Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring). Thus, "where individuals claim federal law immunizes them from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 144 (2d Cir. 2016) (*colatus*). This case falls within that framework. By claiming that 6 U.S.C. § 211 preempts the Traveler Health Form requirement, plaintiff asserts a defense that would otherwise be available in a proceeding to enforce the $10,000 fine. He need not "expose [him]self to . . . liability before bringing suit to challenge a statute alleged to violate federal law." Id. (cleaned up).

The Governor nevertheless insists that this case cannot proceed under Ex parte Young because, in his view, 6 U.S.C. § 211 implicitly precludes private enforcement. See Armstrong, 575 U.S. at 328. This argument misconstrues the nature of this suit. Plaintiff does not seek to *enforce* 6 U.S.C. § 211; he invokes it as a shield against state regulation. "In such circumstances, a plaintiff does not ask equity to create a remedy not authorized by the underlying law. Rather, [the plaintiff] generally invokes equity preemptively to assert a defense that would be available to [the plaintiff] in a state or local enforcement action." Friends of the E. Hampton Airport, 841 F.3d at 144 (citing Va. Off., 563 U.S. at 262 (Kennedy, J., concurring)). Therefore, I must address the preemption claim on the merits.[10]

Preemption comes in three forms: "conflict," "express," and "field." Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S. Ct. 1461, 1480 (2018) (quoting English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990)). All agree that the first two forms are absent. The contested question involves the third. This so-called "field preemption" is a form of implied preemption. See, e.g.,

---

[10] In addressing Ex parte Young, the Governor has not argued that the Commissioner of the Department of Health is the proper defendant. See generally Chrysafis v. James, No. 21-cv-998, 2021 WL 1405884, at *14–21 (E.D.N.Y. Apr. 14, 2021) (addressing this issue).

Kansas v. Garcia, 140 S. Ct. 791, 801 (2020). It arises when Congress has "legislated so comprehensively in a particular field that it left no room for supplementary state legislation," id. at 804 (quoting another source), or when "there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," Arizona v. United States, 567 U.S. 387, 399 (2012) (*colatus*). In these "rare cases," Garcia, 140 S. Ct. at 804, "even complementary state regulation is impermissible," Arizona, 567 U.S. at 401.

The first step, of course, is to "identify the field" that "Congress has implicitly ousted the States from regulating." Garcia, 140 S. Ct. at 804. The step is easy to state, but the hard part is how to go about it. Compare Va. Uranium, Inc. v. Warren, 139 S. Ct. 1894, 1905-06 (2019) (lead opinion of Gorsuch, J.) with id. at 1912 (Ginsburg, J., concurring in the judgment).[11] Generally speaking, though, courts define the field "by reference to the purpose of the state law in question" and "the state law's actual effect." Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n, 634 F.3d 206, 211 (2d Cir. 2011) (quoting English, 496 U.S. at 84).

Under this framework, the field is not, as plaintiff contends, "admission into the United States." The Traveler Health Form does not address that issue, because a failure to complete the form does not result in a denial of admission. It instead results in a $10,000 fine or a short term of imprisonment. Although plaintiff insists that the Governor will also bar him from entering the United States, plaintiff has not cited any statute, regulation, or executive order that confers that authority. Nor has plaintiff plausibly alleged that state officials are exceeding their legal authority and preventing travelers from entering the country unless they complete the form.

---

[11] In Virginia Uranium, the six-Justice majority split evenly, with Justice Gorsuch writing for three Justices and Justice Ginsburg writing for the others. Unless otherwise noted, citations to Virginia Uranium refer to Justice Gorsuch's opinion.

7

See Weisshaus, 2021 WL 103481, at *6. So "admission into the United States" is not the relevant field.

The field instead concerns matters of public health. In both purpose and effect, the Traveler Health Form requirement does exactly what its name suggests: it extracts health information from incoming travelers. This information allows the State to identify symptomatic travelers, enforce quarantine requirements, and perform contact tracing. The relevant field, therefore, is public health inspection at a state border.

This field implicates the State's police power "to protect the health and safety of [its] citizens." Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996). "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" Arizona, 567 U.S. at 400 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); see also N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health, 556 F.3d 114, 123 (2d Cir. 2009). "That rule of construction rests on an assumption about congressional intent: that Congress does not exercise lightly the extraordinary power to legislate in areas traditionally regulated by the States." Arizona v. Inter Tribal Council of Ariz., Inc., 570 U.S. 1, 13 (2013) (quoting another source). And because the requirement to complete the Traveler Health Form is, at its core, a health law, a "particularly strong" assumption applies here. See U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York, 708 F.3d 428, 432 (2d Cir. 2013) (citing Medtronic, 518 U.S. at 475, 485).

Plaintiff cannot overcome that assumption. To find a clear and manifest preemptive purpose, he must rely on "the text and structure of the [federal] statute at issue." Va. Uranium, 139 S. Ct. at 1907 (quoting another source). But the text and structure of 6 U.S.C. § 211 are unavailing. The statute has no preemption clause. It instead assigns a long list of duties to

8

Customs and Border Protection.  See § 211(c).  The agency must "ensure the interdiction of persons and goods illegally entering or exiting the United States," § 211(c)(2), "safeguard the borders of the United States to protect against the entry of dangerous goods," § 211(c)(6), and "implement screening and targeting capabilities, including the screening, reviewing, identifying, and prioritizing of passengers and cargo across all international modes of transportation, both inbound and outbound," § 211(c)(9).  These duties require various types of screening, including screening for violations of trade laws, of immigration laws, of agricultural laws, and the like.  See § 211(c)(1)-(19).  Yet screening for disease is conspicuously absent.  And if Congress did not address this type of screening, "it is hard to see how or why state law on the subject would be preempted."  See Va. Uranium, 139 S. Ct. at 1912 (Ginsburg, J., concurring in the judgment).

Another statute adds to this skepticism.  In the Public Health Service Act, Congress directly addressed screening for diseases at the border.  See 42 U.S.C. § 264.  This statute authorizes the Surgeon General to promulgate regulations "necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession."  § 264(a).[12]  This statute also allows the "apprehension and examination" of certain infected travelers.  § 264(d).  Crucially, however, it contains a preemption clause:

> Nothing in this section or section 266 of this title [which provides special quarantine powers in times of war], or the regulations promulgated under such sections, may be construed as superseding any provision under State law (including regulations and including provisions established by political subdivisions of States), except to the extent that such a provision conflicts with an exercise of Federal authority under this section or section 266 of this title.

---

[12] This authority has since been transferred to the Secretary of Health and Human Services, who has delegated some authority to the CDC.  See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev., 992 F.3d 518, 521 & n.1 (6th Cir. 2021).

9

42 U.S.C. § 264(e). With this clause, Congress limited itself to "conflict preemption." In other words, Congress chose not to occupy the field.

That was no accident. When Congress added this preemption clause, it legislated against a long history of state regulation in the field of public health inspections. The Constitution itself speaks of state inspections at the border. See Art. I, § 10, cl. 2; Arizona, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part). That power to perform inspections accompanies a power to enact quarantine laws. Gibbons v. Ogden, 22 U.S. 1, 203 (1824). And the Supreme Court has repeatedly stated that these laws are valid until a federal statute preempts them. See id. at 203-04; Minn. Rate Cases, 230 U.S. 352, 406–08 (1913); Compagnie Francaise de Navigation a Vapeur v. Bd. of Health of State of La., 186 U.S. 380, 391 (1902); Jacobson v. Massachusetts, 197 U.S. 11, 24-26 (1905); Louisiana v. Texas, 176 U.S. 1, 21-22 (1900); Hannibal & St. J.R. Co. v. Husen, 95 U.S. 465, 470-72 (1877); see also Arjun K. Jaikumar, Red Flags in Federal Quarantine: The Questionable Constitutionality of Federal Quarantine After NFIB v. Sebelius, 114 Colum. L. Rev. 677, 684-96 (2014) (offering a detailed history of preemption issues involving state quarantine laws).

These cases show that one of plaintiff's main contentions – that the States have no power at a port of entry – simply is not true. Take Morgan's Louisiana & T. R. & S. S. Co. v. Board of Health of the State of Louisiana, 118 U.S. 455 (1886) ("Morgan's Steamship"). There, a unanimous Court rejected an argument that Louisiana's quarantine laws infringed upon Congress's exclusive power to regulate interstate commerce. The laws required incoming vessels to pay a fee for an inspection at a quarantine station in New Orleans. The Court acknowledged that this system affected international travelers. But that fact did not undermine the laws – it justified them:

> The services for which these fees are to be collected are parts of a system of quarantine, provided by the laws of Louisiana for the protection of the state, and especially of New Orleans, an important commercial city, from infectious and contagious diseases which might be brought there by vessels coming through the Gulf of Mexico from all parts of the world, and up the Mississippi river to New Orleans. . . .
>
> If there is any merit or success in guarding against these diseases by modes of exclusion, of which the professional opinion of medical men in America is becoming more convinced of late years, the situation of the city of New Orleans for rendering this exclusion effective is one which invites in the strongest manner the effort.

Id. at 456-60. Thus, the Court concluded, quarantine laws "belong to that class of state legislation . . . which are valid until displaced or contravened by some legislation of congress." Id. at 465.

The Court went on to hold that Congress had not displaced the State's quarantine laws, and its reasoning applies with equal force today. First, Congress could have – but had not – preempted state law by establishing a "general system of quarantine" or "confid[ing] the execution of the details of such a system to a national board of health." Id. at 464. Second, when Congress did address inspections for diseases, it expressly limited the law's preemptive effect. The law in question authorized the Surgeon General to address the "importation of disease," but it also provided that "there shall be no interference in any manner with any quarantine laws or regulations as they now exist, or may hereafter be adopted, under state laws." Id. This language "clearly" showed that Congress intended "to recognize the power of the states," id., just as the Public Health Service Act does today.

Although much has changed since Morgan's Steamship, federal law continues to "mandate[] federal noninterference and cooperation with the states' execution of their quarantine laws." Hickox v. Christie, 205 F. Supp. 3d 579, 590 (D.N.J. 2016) (citing Morgan's Steamship, 118 U.S. at 464-65). So when international travelers have passed through CDC quarantine

11

stations, states have still ordered those travelers to isolate.  See Liberian Cmty. Ass'n, 970 F.3d at 197 (Chin, J., concurring in part and dissenting in part) (describing travelers who returned from Liberia during the Ebola epidemic); Hickox, 205 F. Supp. 3d at 591 (describing a nurse who returned after treating Ebola patients in Sierra Leone).  If states can force international travelers to isolate, states can require those travelers to fill out a form.

Plaintiff's cases do not compel a different conclusion.  He first points to Henderson v. Mayor of the City of New York, 92 U.S. 259 (1875).  That case struck down a New York law requiring vessel owners to post an exorbitant bond (or pay a small fee) for every foreign passenger aboard.  The Supreme Court held that this law impermissibly infringed on Congress's power under the Commerce Clause.  But the Court explicitly left open "[w]hether, in the absence of [Congressional] action, the States can, or how far they can, by appropriate legislation, protect themselves against . . . diseased persons[] arriving in their territory from foreign countries."  Id. at 275.  The Court has since answered that question – and in an opinion from the same author.  See Morgan's Steamship, 118 U.S. at 465.

After citing Henderson, plaintiff skips an entire century and lands on Arizona v. United States, 567 U.S. 387 (2012).  It struck down several Arizona laws that imposed penalties for failures to comply with federal immigration requirements.  These laws were preempted, the Court explained, because "[f]ederal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders."  Id. at 401-02.  But the Traveler Health Form requirement does not fall within the field of alien registration; it seeks the same health information from aliens and non-aliens alike.  The form instead belongs to the field of public health inspection, and federal law does not create a

comprehensive and unified system in that field.  Cf. Garcia, 140 S. Ct. at 806 (limiting Arizona in a similar fashion).

With neither statutes nor cases to help him, plaintiff falls back on more general concerns. He emphasizes the federal government's general control over the border.  But preemption analysis is not a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," Chamber of Com. v. Whiting, 563 U.S. 582, 607 (2011) (quoting another source) and "[i]nvoking some brooding federal interest . . . should never be enough to win preemption of a state law," Va. Uranium, 139 S. Ct. at 1901.  A litigant must instead "point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law."  Id. (quoting another source).  Here, plaintiff cannot point to any federal law that preempts the Traveler Health Form requirement.  He has therefore failed to state a claim.

## III. The Remaining Claims

Plaintiff's filings focus almost exclusively on the Supremacy Clause.  He states: "This whole case can be resolved by answering a single and simple question, whether [the Governor] has any legal authority to intercept people exiting the door of a facility that is under the exclusive regulatory sphere of Congress."  This language somewhat suggests that plaintiff has dropped his remaining clams.  At other points, however, plaintiff references the doctrines on which he based his other claims – specifically, the claims based on the right to interstate travel, the freedom of international travel, the right to informational privacy, and the substantive component of the Due Process Clause of the Fourteenth Amendment.  To the extent plaintiff's *pro se* status compels consideration of these claims, I reject them for the same reasons I articulated in denying the motion for a preliminary injunction.  See Weisshaus, 2021 WL 103481, at *6-11.

## CONCLUSION

The Governor's motion to dismiss [22] is granted. The Clerk is directed to enter judgment, dismissing the case.

**SO ORDERED.**

                                      Digitally signed by Brian M. Cogan
                                      _____
                                                         U.S.D.J.

Dated: Brooklyn, New York
          June 20, 2021